Slip Op. 18-75

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOC TRANG SEAFOOD JOINT STOCK COMPANY ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiff,** | |
| **and** | |
| **CA MAU SEAFOOD JOINT STOCK COMPANY,** | |
| **Plaintiff-Intervenor,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Consol. Court No. 16-00205** |
| **Defendant,** | |
| **and** | |
| **AD HOC SHRIMP TRADE ACTION COMMITTEE,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the tenth administrative review of certain frozen warmwater shrimp from the Socialist Republic of Vietnam.]

Dated: June 21, 2018

Matthew Robert Nicely, Daniel Martin Witkowski, and Julia K. Eppard, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiffs, Soc Trang Seafood Joint Stock Company a/k/a Stapimex; Trong Nhan Seafood Company Limited; Sao Ta Foods Joint Stock Company a/k/a Fimex VN a/k/a Saota Seafood Factory; Nha Trang Seafoods Group: Nha Trang Seaproduct Company a/k/a NT Seafoods Corporation a/k/a Nha Trang Seafoods - F.89 Joint Stock Company a/k/a NTSF Seafoods Joint Stock Company; Viet Foods Co., Ltd.; UTXI Aquatic Products Processing Corporation a/k/a Hoang Phuong

Seafood Factory a/k/a Hoang Phong Seafood Factory; Camau Frozen Seafood Processing Import Export Corporation a/k/a Camau Seafood Factory No. 4; Ngoc Tri Seafood Joint Stock Company; Investment Commerce Fisheries Corporation; Quang Minh Seafood Co., Ltd.; Phuong Nam Foodstuff Corp.; Minh Cuong Seafood Import Export Frozen Processing Joint Stock Company; Minh Hai Joint-Stock Seafoods Processing Company; Cadovimex Seafood Import-Export and Processing Joint Stock Company; Can Tho Import Export Fishery Limited Company; Danang Seaproducts Import Export Corporation a/k/a Danang Seaproducts Import-Export Corporation a/k/a Seaprodex Danang a/k/a Tho Quang Co. a/k/a Tho Quang Seafood Processing and Export Company a/k/a Frozen Seafoods Factory No. 32; Vietnam Clean Seafood Corporation; Viet I-Mei Frozen Foods Co., Ltd.; Kim Anh Company Limited a/k/a Kim Anh Co., Ltd.; Viet Hai Seafood Co., Ltd. a/k/a Vietnam Fish One Co., Ltd.; Thuan Phuoc Seafoods and Trading Corporation; Bac Lieu Fisheries Joint Stock Company; Nha Trang Fisheries Joint Stock Company; Thong Thuan Company Limited a/k/a T&T Co., Ltd.; Cuulong Seaproducts Company; Camau Seafood Processing and Service Joint Stock Company; Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd.; C.P. Vietnam Corporation; and Minh Hai Export Frozen Seafood Processing Joint-Stock Company, and for plaintiff-intervenor Ca Mau Seafood Joint Stock Company a/k/a Seaprimexco Vietnam.

<u>Jonathan Michael Freed</u>, Trade Pacific, PLLC, of Washington, DC, argued for consolidated plaintiff, Mazzetta Company LLC. With him on the brief were <u>Robert George Gosselink</u> and <u>Jarrod Mark Goldfeder</u>.

<u>Kara Marie Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Patricia M. McCarthy</u>, Assistant Director, <u>Jeanne E. Davidson</u>, Director, and <u>Chad A. Readler</u>, Principal Deputy Assistant Attorney General. Of Counsel on the brief was <u>James Henry Ahrens II</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Nathaniel Jude Maandig Rickard</u>, Picard, Kentz & Rowe, LLP, of Washington, DC, argued for defendant-intervenor and consolidated defendant-intervenor, Ad Hoc Shrimp Trade Action Committee. With him on the brief was <u>Meixuan (Michelle) Li</u>.

Kelly, Judge:  This consolidated action is before the court on two motions for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the tenth administrative review of the antidumping duty ("ADD") order covering certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam").  <u>See</u> Pls. & Pl.-Intervenor's Rule 56.2

Mot. J. Agency R., June 5, 2017, ECF No. 38; Consol.-Pl.'s Rule 56.2 Mot. J. Agency R.,

June 5, 2017, ECF No. 39; see also Certain Frozen Warmwater Shrimp From [Vietnam],

81 Fed. Reg. 62,717 (Dep't Commerce Sept. 12, 2016) (final results of [ADD]

administrative review, 2014–2015) ("Final Results") and accompanying Certain Frozen

Warmwater Shrimp from [Vietnam]: Issues and Decision Mem. for the Final Results, A-

552-802, (Sept. 6, 2016), ECF No. 19-2 ("Final Decision Memo"); Certain Frozen

Warmwater Shrimp From [Vietnam], 70 Fed. Reg. 5,152 (Dep't Commerce Feb. 1, 2005)

(notice of amended final determination of sales at less than fair value and [ADD] order)

("ADD Order").

Plaintiffs Soc Trang Seafood Joint Stock Company a/k/a Stapimex et al., foreign

producers and exporters of the subject merchandise, commenced this action pursuant to

section 516A(a)(2)(B)(iii) and 516A(d) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 1516a(d) (2012).[1]  See Summons, Oct. 7, 2016, ECF No. 1;

Compl., Oct. 28, 2016, ECF No. 8.[2]  Plaintiff-Intervenor, Ca Mau Seafood Joint Stock

Company a/k/a Seaprimexco Vietnam, intervened as of right, see Order, Mar. 1, 2017,

ECF No. 27, and, together with the above named Plaintiffs, the court refers to these

parties as "Respondents."

The Respondents challenge four aspects of Commerce's final determination.  See

Pls. & Pl.-Intervenor's Mem. Supp. Rule 56.2 Mot. J. Agency R., June 5, 2017, ECF No.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2]  The action was consolidated with an action filed by Mazzetta which challenges aspects of the same final determination.  See Order, Feb. 3, 2017, ECF No. 23.

38-2 ("Respondents' Br."). First, the Respondents challenge as not in accordance with law and unsupported by substantial evidence Commerce's differential pricing analysis. Id. at 7–35. Second, the Respondents challenge Commerce's selection of surrogate value data sources to value head and shell byproducts, frozen shrimp, and ice. Id. at 35–43. Third, the Respondents challenge Commerce's decision to deny a byproduct offset for revenue from excess or scrap packaging. Id. at 43–45. Fourth, the Respondents challenge as not in accordance with law and unsupported by substantial evidence Commerce's calculation of the all-others separate rate. Id. at 45–46.

Mazzetta Company, LLC ("Mazzetta"), an importer of subject merchandise, challenges two aspects of Commerce's final determination. See Mem. Consol.-Pl. [Mazzetta] in Supp. Mot. J. Agency R. Pursuant Rule 56.2, June 5, 2017, ECF No. 39-1 ("Mazzetta Br."). First, Mazzetta argues that Commerce improperly omitted from the record documentation and memoranda memorializing the events that it claims led to the rescission of Commerce's review of Minh Phu Seafood Corporation, Minh Qui Seafood Co., Ltd., Minh Phat Seafood Co., Ltd., and Minh Phu Hau Giang Seafood Joint Stock Company (collectively, "Minh Phu Group" or "MPG"). See id. at 22–25; see also [ADD] Administrative Review of Certain Frozen Warmwater Shrimp from [Vietnam]: Selection of Respondents for Individual Examination at 7, PD 71, bar code 3273103-01 (Apr. 29, 2015) ("Resp't Selection Memo").[3] Second, Mazzetta challenges as not in accordance

---

[3] On December 6, 2016, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination. These indices are located on the docket at ECF No. 19-3–4. All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in these indices.

with law and unsupported by substantial evidence Commerce's calculation of the all-others separate rate.  <u>See</u> Mazzetta Br. at 25–43.

For the reasons that follow, the court sustains Commerce's application of the differential pricing analysis and calculation of the all-others rate, and Commerce's surrogate value data selections for head and shell byproduct and ice.  The court also determines that Commerce fulfilled its statutory duty to maintain a complete and accurate administrative record.  However, the court remands Commerce's surrogate value data selection for frozen shrimp, and Commerce's decision to deny an offset for packaging scrap revenue for further explanation or reconsideration consistent with this opinion.

## BACKGROUND

Commerce initiated this tenth administrative review covering subject imports entered during the period of review ("POR"), February 1, 2014 through January 31, 2015. <u>See</u> <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 80 Fed. Reg. 18,202, 18,204 (Dep't Commerce Apr. 3, 2015).  Commerce subsequently selected MPG and Soc Trang Seafood Joint Stock Company ("Stapimex") as mandatory respondents in this review.  <u>See</u> Resp't Selection Memo at 9.  Because Vietnam is a non-market-economy ("NME"), Commerce "begins with a rebuttable presumption that all companies within Vietnam are subject to government control."  Final Decision Memo at 76.  Based on this presumption, Commerce assigns all exporters of the subject merchandise in a NME country a single antidumping duty rate.  <u>Id.</u>  However, if an exporter can demonstrate the absence of government control, Commerce will calculate for it a separate rate.  <u>Id.</u>  Companies, other than the mandatory respondents, who are

able to demonstrate the absence of government control are assigned the separate all-others rate.  Id.  Commerce has a practice of calculating the separate rate in the same manner as the all-others rate in investigations provided for in 19 U.S.C. § 1673d(c)(5).  See Final Decision Memo at 62–63; see also Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).  Accordingly, the separate all-others rate is "an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available."  Id. at 63.

Commerce published its preliminary results on March 10, 2016.  See Certain Frozen Warmwater Shrimp From [Vietnam], 81 Fed. Reg. 12,702 (Dep't Commerce Mar. 10, 2016) (preliminary results of [ADD] administrative review and partial rescission of review; 2014–2015) ("Prelim. Results") and accompanying Decision Mem. for Preliminary Results of [ADD] Administrative Review: Certain Frozen Warmwater Shrimp from [Vietnam]; 2014–2015, A-552-802, PD 312, bar code 3446491-01 (Mar. 3, 2016) ("Prelim. Decision Memo").  Commerce preliminarily calculated weighted-average dumping margins of 2.86% for MPG, 4.78% for Stapimex, and 3.56% for all-other separate rate respondents.  Prelim. Results, 81 Fed. Reg. at 12,703.  Commerce applied its differential pricing analysis and determined that 78.00% of Stapimex's U.S. sales passed its Cohen's d test, that the Average-to-Average ("A-to-A") methodology could not account for the price differences, and that application of the Average-to-Transaction ("A-to-T") methodology to all of Stapimex's U.S. sales was appropriate to calculate Stapimex's weighted-average

dumping margin.   Prelim. Decision Memo at 21.   In the preliminary determination, Commerce also applied its differential pricing analysis to MPG and determined that 55.10% of MPG's U.S. sales passed its Cohen's d test, that the A-to-A methodology could not account for the price differences, and applied the A-to-T methodology to MPG's U.S. sales that passed the Cohen's d and the A-to-A methodology to the U.S. sales that did not.  Id. at 20–21.

On July 22, 2016, Commerce rescinded its review of MPG, one of the mandatory respondents.[4]  See Certain Frozen Warmwater Shrimp From [Vietnam], 81 Fed. Reg. 47,758 (Dep't Commerce July 22, 2016) (partial rescission of [ADD] administrative reviews (2014–2015; 2015–2016) and compromise of outstanding claims) ("Rescission Notice").   Following the rescission, the Respondents and Mazzetta submitted supplemental briefing to Commerce, arguing that Commerce should continue to rely on the weighted-average dumping margins calculated for both Stapimex and MPG to calculate the all-others rate.  See [Enclosed] Suppl. Case Br. on Behalf of VASEP & its Non-Mandatory Resp't Members at 1–5, PD 348, bar code 3498415-01 (Aug. 16, 2016); [Mazzetta] Additional Briefing at 2–8, PD 349, bar code 3498417-01 (Aug. 16, 2016).  In its final determination, Commerce continued to calculate a weighted-average dumping margin of 4.78% for Stapimex.  Final Results, 81 Fed. Reg. at 62,718.  However, as a result of the rescission, no rate was calculated for MPG and Commerce assigned

---

[4] All parties who initially requested review of MPG withdrew their requests and requested that Commerce rescind its review of MPG.  See Rescission Notice, 81 Fed. Reg. at 47,758.  The parties' requests to rescind were submitted after the applicable 90-day deadline passed.  See id. Commerce found it was reasonable to extend the deadline, and rescinded its review of MPG. See id.

Stapimex's rate as the all-others rate.  See id.  The court held oral argument on the issues

raised by this action on April 30, 2018.  See Oral Arg., Apr. 30, 2018, ECF No. 68.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C.

§ 1581(c) (2012), which grant the court authority to review actions contesting the final

determination in an administrative review of an antidumping duty order.  The court will

uphold Commerce's determination unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Application of Commerce's Differential Pricing Analysis

The Respondents challenge Commerce's differential pricing analysis as contrary

to law and not supported by substantial evidence.  See Respondents' Br. at 13–35.

Specifically, they argue that Commerce's application of the differential pricing analysis

does not identify whether a price difference is significant, see id. 13–22, does not

effectuate the statutory purpose of 19 U.S.C. § 1677f-1(d)(B)(1)(i), id. at 22–31, and that

Commerce unreasonably excludes the test sales from the comparison group.  See id.

31–35.  Defendant argues that Commerce's application of the differential pricing analysis

is settled law and its application is supported by substantial evidence.  See Def.'s Resp.

Opp'n Pls.' Rule 56.2 Mots. J. Agency R. at 31–39, Nov. 21, 2017, ECF No. 51 ("Def.'s

Resp. Br.").  For the following reasons, Commerce's application of the differential pricing

analysis is in accordance with law, is supported by substantial evidence and is sustained.

In investigations, Commerce ordinarily uses the A-to-A methodology to calculate dumping margins.[5]  See 19 U.S.C. § 1677f-1(d)(1)(A); 19 C.F.R. § 351.414(c)(i) (2015).[6] However, Commerce may use the alternative A-to-T methodology to calculate weighted-average dumping margins where: (i) Commerce finds a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) Commerce explains why such differences cannot be taken into account using the standard A-to-A methodology.  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  Commerce has, through practice, adopted the same basis for applying its A-to-T methodology in administrative reviews.  See JBF RAK LLC v. United States, 790 F. 3d 1358, 1364 (Fed. Cir. 2015).[7]  The statute is silent as to how Commerce is to determine whether a pattern of significant price differences exists.  However, the Statement of Administrative Action ("SAA"), which is "an authoritative expression by the United States concerning the interpretation and application" of the Uruguay Rounds Agreement Act, provides guidance. 19 U.S.C. § 3512(d).  In relevant part, the SAA states that

> the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal "targeted dumping." In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or

---

[5] Under the A-to-A methodology, Commerce compares the weighted-average of the normal value of the merchandise to the weighted-average of the export prices (or constructed export prices) for comparable merchandise.  See id.  Although the transaction-to-transaction methodology ("T-to-T"), which is "a comparison of the normal values of individual transactions to the export prices of individual transactions," is also a statutorily preferred method (under 19 U.S.C. § 1677f-1(d)(1)(A)(ii)), Commerce's regulations provide that T-to-T will be employed only in rare cases, "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

[6] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

[7] The Court of Appeals for the Federal Circuit has held Commerce's application of the alternative A-to-T method in administrative reviews to be reasonable.  See JBF, 790 F. 3d at 1364.

regions. . . . New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring. Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist. Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 842–43 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78.

The statute affords Commerce discretion in determining whether a pattern of significant price differences exists.  See Fujitsu General Ltd., 88 F.3d 1034, 1039 (Fed. Cir. 1996); Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995). Nonetheless, the court must address whether Commerce's methodological choice is reasonable and determine that Commerce's conclusions are supported by substantial evidence.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); see Smith-Corona Grp. v. United States, 713 F.2d 1568, 1571 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984); Fujitsu Gen. Ltd., 88 F.3d at 1039 (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

Commerce determines whether a pattern of significant price differences exists among purchasers, regions, or periods of time with the differential pricing analysis.  <u>See</u> Final Decision Memo at 8.  First, Commerce applies what it refers to as the "Cohen's d test," which measures the degree of price disparity between two groups of sales.  <u>See id.</u> at 8–9.  Commerce calculates the number of standard deviations by which the weighted-average net prices of U.S. sales for a particular purchaser, region, or time period (the "test group") differ from the weighted-average net prices of all other U.S. sales of comparable merchandise (the "comparison group").[8]  <u>See id.</u> at 9.  The result of this calculation is a coefficient.  <u>See id.</u>  To arrive at the coefficient, Commerce divides the difference in the means of the net prices of the test group and comparison group by the pooled standard deviation.[9]  <u>See id.</u> at 19 n.68 (reproducing the formula).  The coefficient is the number of standard deviations by which the weighted-average of the comparison

---

[8] As Commerce explained,

> Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (<u>i.e.</u>, zip code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.
>
> Time periods are defined by the quarter within the period of review based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that the Department uses in making comparisons between [export price] and normal value for the individual dumping margins.

Prelim. Decision Memo at 19. To calculate a coefficient for a particular test group (all sales of the comparable merchandise to a specific purchaser, region, or time period), the test group and comparison group (all other sales of the comparable merchandise) must each have at least two observations and the sales quantity for the comparison group must account for at least five percent of the total sales quantity of the comparable merchandise. <u>See id.</u>

[9] The pooled standard deviation is derived using the simple average of the variances in the net prices within the test and comparison groups. <u>See</u> Final Decision Memo at 9, 19 n.67 (reproducing the formula for calculating the pooled standard deviation).

group and the test group differ.[10]  <u>See</u> Prelim. Decision Memo at 19.  A group of sales with a coefficient equal to or greater than 0.8 is said to "pass" the test, which signifies to Commerce that a significant pattern of price differences exists within that group of sales. <u>See</u> <u>id.</u>; Final Decision Memo at 9.  Commerce then relies on the "ratio test" to measure the extent of significant price differences.  <u>See</u> Final Decision Memo at 8.  The "ratio test" compares the combined value of sales that passed the Cohen's d test with the value of all sales.  <u>See</u> Prelim. Decision Memo at 19–20.  If the value of sales that passed the test accounts for 66% or more of a respondent's total sales, that indicates to Commerce that the pattern of significant price differences warrants application of the A-to-T method to all sales.  <u>See</u> <u>id.</u>  However, if the value of sales that passed the Cohen's d test is less than 66%, but more than 33%, Commerce takes a hybrid approach, applying the A-to-T method to the sales that passed its Cohen's d test and applying the A-to-A method to all other sales.  <u>See</u> <u>id.</u>  Alternatively, Commerce will apply the A-to-A method to all sales if 33% or less of a respondent's total sales passed its Cohen's d test.  <u>Id.</u> at 20.  Finally, Commerce applies the "meaningful difference" test, pursuant to which Commerce evaluates whether the difference between the weighted-average dumping margins calculated by the A-to-A method is "meaningfully" different than the weighted-average dumping margins calculated by the A-to-T method.[11]  <u>Id.</u> at 21.

---

[10] Commerce quantifies the extent of the differences by one of three thresholds: "small" "medium," or "large."  Prelim. Decision Memo at 19.  A coefficient falling in the "large" threshold is equal to or greater than 0.8.  <u>Id.</u>

[11] A difference is meaningful if:

(footnote continued)

Commerce's differential pricing analysis, as applied, constitutes a reasonable methodology for identifying patterns of prices that differ significantly and is therefore in accordance with law.  As applied by Commerce, this tool measures "the extent to which the net prices to a particular purchaser, region, or time period [i.e., the test group] differ significantly from the net prices of all other sales of comparable merchandise [i.e., the base or comparison group]."[12]  Prelim. Decision Memo at 8; see Final Decision Memo at 8–9.

Further, it is reasonable for Commerce to apply its differential pricing analysis to determine whether a pattern exists for an individual exporter based on the exporter's purchasers, regions, or time period.  The SAA specifically speaks to individual exporters' behavior that may result in masked targeted dumping and suggests that the methodology constructed by Commerce can look for patterns in individual exporter's actions.  See SAA at 843, 1994 U.S.C.C.A.N. at 4178.  Moreover, the SAA's explanation that "Commerce will proceed on a case-by-case" to determine whether the price differences are significant, see SAA at 843, 1994 U.S.C.C.A.N. at 4178, does not mandate that Commerce amend

---

1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the the de minimis threshold, or 2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the de minimis threshold.

Prelim. Decision Memo at 20.

[12] The Court of Appeals for the Federal Circuit and this Court have addressed, in detail, the reasonableness of the steps underlying the differential pricing analysis as applied by Commerce. See Apex Frozen Foods Private Ltd. v. United States, 144 F. Supp. 3d 1308, 1313–35 (2016), aff'd, 862 F.3d 1337 (Fed. Cir. 2017); Apex Frozen Foods Private Ltd. v. United States, 208 F. Supp. 3d 1398 (2017); see also Tri Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1303 (2016).

the test at every application.  Instead, it is enough that the resulting methodology is able to detect differences of significant variances across a variety of cases.

The Respondents claim that the SAA demonstrates Congress' intent for Commerce to "tailor" its analysis to the different industry or product under investigation or review, and to not indiscriminately apply the same test across all cases.  See Respondents' Br. at 24.[13]  The Respondents point to nothing in the statute that requires Commerce to construct such a test.  In this regard, the Respondents also argue that Commerce's determination is not supported by substantial evidence.  See id. at 27–30. However, the Respondents' arguments are derivative of their contrary to law challenges. Specifically, they argue that Commerce's final determination is not supported by substantial evidence because the statute requires Commerce to consider information regarding a specific product or industry in running the differential pricing analysis, and Commerce's analysis does not.  Commerce, however, was not required to consider industry-wide information and the Respondents' argument does not demonstrate that what Commerce did was unreasonable.

---

[13] The Respondents also argue that Commerce's use of "small," "medium," and "large" thresholds without consideration of context is warned against by experts on Cohen's d.  See Respondents' Br. at 24–26.  Respondents' invocation of critiques regarding the proper application of the Cohen's d test are unpersuasive.  First, the fact that Commerce has adopted a methodology based upon a statistical tool known as Cohen's d, and chooses to refer to this methodology as Cohen's d, does not diminish the discretion granted to Commerce by Congress. Congress has granted Commerce the discretion to construct a methodology to determine if there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time.  The relevant question is not whether the use of the "small," "medium," and "large" thresholds are warned against by experts on Cohen's d, but whether these thresholds are permitted by statute and reasonable choices to effectuate the goals of the statute.  The Respondents do not explain why Commerce's present application of the differential pricing analysis is unlawful or unreasonable.  Instead, the Respondents make arguments that propose an alternative way of fulfilling the statutory goals.

The Respondents also argue that Commerce's differential pricing analysis does not demonstrate that the price differences are of "practical" significance.   See Respondents' Br. at 15–19.   Specifically, the Respondents contend that the threshold categories of "small," "medium," and "large" are arbitrary because the differences they quantify are not informed by industry trends.[14]   See id.  Here, the Respondents placed on the record, and addressed directly in their brief to the agency, documents evidencing volatilities in the shrimp and seafood prices in Vietnam.[15]   See, e.g., VASEP Submission of Factual Info. on Differential Pricing at Ex. 35, PD 274, bar code 3308867-05 (Sept. 25, 2015); VASEP Submission of Factual Info. on Differential Pricing at Exs. 37–42, 44–45, PD 276–77, bar codes 3308867-07–08 (Sept. 25, 2015); Case Br. [to the Agency] on Behalf of [the] Respondents at 29–33, PD 330, bar code 3463452-01 (Apr. 25, 2016).

---

[14] The Respondents use a hypothetical to illustrate why Commerce's analysis does not account for "practical" significance in the price differences it identifies.  See Respondents' Br. at 18–19. The hypothetical involves two companies—A and B, each making ten sales between test and base customers.  See id.  Pursuant to their hypothetical, eight of the ten sales company A makes between the test and base customers are at the same price, as compared to six of the ten sales company B makes.  Id. at 18.  Based on the sales prices the Respondents assigned to the two companies, the difference in means for [company] B's sales is seven times larger than the difference in means for [company] A's sales."  Id.  However, in applying Commerce's analysis, only company A would be considered to have differential pricing.  Id. at 19.  Commerce addressed like hypotheticals in the final determination and rejected them because the Respondents' calculations conflated the standard deviation with the pooled deviation.  See Final Decision Memo at 18.  Commerce's analysis is reasonable.

[15] The Respondents contend that the identified record evidence provides context necessary to understand why the price variances were not significant.  See Respondents' Br. at 27–30.  They argue that some of Stapimex's sales correlate to periods in the shrimp industry that normally experience price fluctuations, and that if Commerce accounted for these industry-wide fluctuations, it would not have found sales occurring during those periods of time to be differentially priced.  Id. at 28.  By recognizing the fluctuations, the Respondents contend, Commerce would have found that only 49.7% of Stapimex's sales passed the Cohen's d and would have instead applied the hybrid A-to-T and the A-to-A methodologies.  Id.  However, in contending that Commerce should look for patterns in price fluctuations within an industry, the Respondents are merely proposing an alternative methodology.  The Respondents do not demonstrate that Commerce's methodology is unreasonable.

The Respondents contend that Commerce's failure to address industry-specific data rendered the agency unable to evaluate whether a coefficient of 0.8 or higher (Commerce's threshold for a "large" price difference) was practically significant.  See Respondents' Br. at 27–28.  The Respondents' argument is unpersuasive because it assumes that Commerce is required to take into account pricing trends in the shrimp and seafood industries.   However, as explained above, Commerce's application of the differential pricing analysis to individual exporters, without consideration of the industry at large, is a reasonable way of assessing whether a pattern of significant price differences exists.[16]

The Respondents argue that Commerce's methodology unreasonably focuses on internal variances within a respondent's prices.  See Respondents' Br. at 13–15.  To illustrate their argument, the Respondents provide three sets of numbers for which there is a standard deviation of 1.58, but which represent a 0.158%, 1.58%, and 15.8% deviation from the mean as to their respective number sets.  Id. at 14.  The Respondents contend that Commerce's analysis "completely overlook[s]" such "differences in magnitude."  Id.  In the final determination, Commerce explained that its differential pricing

---

[16] The Respondents also argue that the "meaningful difference" test does not negate the arbitrary results of the Cohen's d test.  See Respondents' Br. at 20–22.  Specifically, they contend that the results of the test are arbitrary because the Cohen's d test and the ratio test do not reasonably identify whether prices differ significantly.  Id. at 20–22.  The Respondents' argument is premised on the false assumption that Commerce's methodology yields arbitrary results by not considering the industry more broadly.  See id. at 20–22; see also id. at 15–17.  The challenge fails because Commerce is not required to consider industry-wide data in its analysis.  Further, Commerce sufficiently explains that in applying the "meaningful difference" test Commerce is not only making a determination of whether the variance in U.S. prices is significant, but also that the variance in prices is meaningful as it relates to the U.S. price and the normal value.  See Final Decision Memo at 20–21.

analysis is reasonable because it looks at price variances in the context of the two means. See Final Decision Memo at 20.  Specifically, Commerce explained that, "[w]hen there is little variation in prices, then a small difference in the mean prices between the two groups may be significant where it would not be significant if the variation in prices were greater." Id.  Commerce's explanation addresses the Respondents' challenge.  Commerce's methodology evaluates whether the price variance is significant as compared to the actual prices at issue, and not as compared to some other set of prices.  The statute allows Commerce to look at individual pricing behavior.  See 19 U.S.C. § 1677f-1(d)(B)(1)(i).  As a result, it is reasonable for Commerce to determine whether the price variance is significant relative to a respondent's own pricing behavior in the United States market.

The Respondents also argue that Commerce's exclusion of test group sales from the comparison group sales is not in accordance with law because Commerce's methodology leads to distortions in the dumping comparison and alters what constitutes "normal" pricing behavior.  See Respondents' Br. at 31–35; see also Pls. & Pl.-Intervenor's Reply Supp. Rule 56.2 Mot. J. Agency R. at 5, Jan. 22, 2018, ECF No. 59 ("Respondents' Reply").  In the final determination, Commerce explained that including test group sales in the comparison group "would result in the sales prices of purchasers, regions or time periods being compared to themselves."  Final Decision Memo at 37. Commerce's explanation is reasonable.  Respondents' argument presents an alternative methodology, but does not demonstrate that there is anything unreasonable with the way Commerce approaches the test and comparison groups.

**II.  Memoranda Regarding the WTO Dispute Settlement Agreement Discussions**

Mazzetta argues that Commerce failed to place on the administrative record documents memorializing ex parte discussions from a World Trade Organization ("WTO") dispute settlement agreement reached between the governments of Vietnam and the United States ("WTO Settlement Agreement").[17] See Mazzetta's Br. at 22–25.  Defendant argues that the WTO proceedings do not constitute ex parte meetings because they were not conducted "pursuant" to the tenth administrative review.  Def.'s Resp. Br. at 27. Defendant contends that Commerce is only required to produce and place upon the record information it obtains pursuant to the review and "not any information obtained by Commerce during the period of time coterminous with the initiation and conclusion of the review."  Id. at 29 (citing 19 U.S.C. § 1516a(b)(2)(A); 19 C.F.R. § 351.104(a)(1)).  The Defendant-Intervenor argues that Mazzetta is improperly seeking to enlarge the administrative record, which it cannot do in a USCIT Rule 56.2 motion, see Def.-Intervenor Ad Hoc Shrimp Trade Action Comm.'s Resp. Pl.'s & Pl.-Intervenor's & Consol. Pl.'s Mots. J. Agency R. Under USCIT Rule 56.2 at 11–16, Nov. 21, 2017, ECF No. 50 ("Def.-Intervenor's Resp. Br."), and that Commerce's decision to rescind and its calculation of the all-others rate is supported by substantial evidence on the record before

---

[17] The Respondents do not challenge Commerce's decision not to supplement the administrative record, see Respondents' Br. at 45 n.15.  They do challenge the calculation of the all-others rate and incorporate by reference Mazzetta's arguments on the separate rate issue.  See id. at 45–46; see also Respondents' Reply at 22.

the court.[18] Id. at 19–27.  For the reasons that follow, the court will not require Commerce

to place any additional information on the record.

The applicable statute provides that Commerce

shall maintain a record of any ex parte meeting between—

> (A) interested parties or other persons providing factual information
> in connection with a proceeding, and
>
> (B) the person charged with making the determination, or any person
> charged with making a final recommendation to that person, in
> connection with that proceeding,

if information relating to that proceeding was presented or discussed at such
meeting. The record of such an ex parte meeting shall include the identity
of the persons present at the meeting, the date, time, and place of the
meeting, and a summary of the matters discussed or submitted. The record
of the ex parte meeting shall be included in the record of the proceeding.

---

[18] Mazzetta argues that Commerce's failure to put ex parte communications on the record renders
Commerce's determination contrary to law, unsupported by substantial evidence and inherently
unfair.  See Mazzetta Br. at 22–25.  Mazzetta asks the court to remand this case to Commerce
and order Commerce to supplement the record with the ex parte information and provide parties
an opportunity to comment.  Id. at 23.  The Defendant-Intervenor's argument that Mazzetta's
request is procedurally improper implies that Mazzetta should have moved for supplementation
prior to filing a USCIT Rule 56.2 motion with this Court, and indeed failed to so move before the
agency.  See id. at 12–15.  The Defendant-Intervenor is therefore arguing exhaustion.  See id. at
15–16.  Defendant also argues that Mazzetta failed to exhaust this argument at the agency level
and merely asserted, in a footnote, that the record did not contain the WTO Settlement
Agreement.  See Def.'s Resp. Br. at 27.  However, the issue of whether the WTO meetings
constituted ex parte meetings that triggered a statutory requirement to disclose is a pure question
of law and the court may, in its discretion, determine that the argument did not need to be
exhausted before Commerce.  See Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1029
(Fed. Cir. 2007) (noting that "the Court of International Trade has developed and refined a pure
legal question exception to the exhaustion requirement in trade cases," and finding that the Court
did not abuse its discretion in applying that exception in that case).  Further, following the
publication of the Rescission Notice, Mazzetta sought to raise the issue of discussions at the
WTO, supplementation, and to challenge the basis for the rescission, see Certain Frozen
Warmwater Shrimp from Vietnam—Notice of Appearance & Request for Additional Opportunity
to Comment at 1–3, PD 341, bar code 3490533 (July 25, 2016), and was explicitly told that it
could not do so.  See Certain Warmwater Shrimp from [Vietnam]: Request [from Commerce] for
Additional Briefing, PD 345, bar code 3497142-01 (Aug. 11, 2016).  Therefore, the court will not
preclude Mazzetta from making any arguments concerning the need to supplement the record
here.

19 U.S.C. § 1677f(a)(3).[19]

To trigger the disclosure requirements of 19 U.S.C. § 1677f(a)(3), there must be a meeting (i) between "persons providing factual information in connection with a proceeding . . . and the person charged with making the determination" and (ii) "information relating to that proceeding [must be] presented or discussed at such [a] meeting." 19 U.S.C. § 1677f(a)(3).[20] Parties cannot rely upon speculation that ex parte communications occurred, but must establish that a reasonable basis exists to believe that the administrative record is incomplete. See Sachs Auto. Prod. Co. v. United States, 17 CIT 290, 292–93 (1993); Saha Thai Steel Pipe Co. v. United States, 11 CIT 257, 261–62, 661 F.Supp. 1198, 1202–03 (1987); see also CSC Sugar LLC v. United States, 42

---

[19] Commerce's regulation further provides that the agency is to "include in the official record [of each ADD and countervailing duty proceeding] all factual information, written argument, or other material developed by, presented to, or obtained by [Commerce] during the course of a proceeding that pertains to the proceeding," including "government memoranda pertaining to the proceeding, memoranda of ex parte meetings, determinations, notices published in the Federal Register, and transcripts of hearings." 19 C.F.R. § 351.104(a)(1).

[20] The administrative record of this action includes two letters that specifically reference a connection between the WTO Settlement Agreement and this review. See [Attached] Letter from the Deputy Minister of the Ministry of Industry and Trade of [Vietnam] to Commerce, PD 352, bar code 3503503-01 (Aug. 29, 2016) ("GOV Letter to Commerce"); Letter from Commerce to the Deputy Minister of the Ministry of Industry and Trade of [Vietnam] at Attach. I, PD 366, bar code 3506156-01 (Sept. 7, 2016) ("Commerce's Letter to the GOV"). These letters indicate that the WTO settlement negotiations cleared the path for the tenth administrative review to be rescinded as to MPG. See GOV Letter to Commerce ("As you know, [MPG] has been exempted from the pending 10th administrative review (AR10) of the [ADD] Order on Certain Frozen Warmwater Shrimp from Vietnam, pursuant to our settlement."); Commerce's Letter to the GOV (explaining that "the Minh Phu Group was no longer under review as a result of our settlement agreement" and noting that, "[t]o the extent that our settlement (which allowed for the rescission of AR10 with respect to the Minh Phu Group) affects companies who were not parties to the settlement, counsel for your government and the Minh Phu Group did not raise such concerns in any of our discussions.").

CIT __, __, Slip Op. 18-64 at 8 (June 1, 2018) (taking judicial notice of a newspaper article

to find a "reasonable basis to believe [that] the record [wa]s incomplete.").

Commerce was not required to place memoranda relating to the WTO dispute

negotiations proceedings on the record.[21]  Here, Mazzetta argues that Commerce met

with "persons," specifically, the government of Vietnam.  See Mazzetta's Br. at 23–24.

However, Mazzetta incorrectly states that Commerce relied upon the "meetings and

agreement" as "justification for rescinding the review of Minh Phu Group[.]"  See id. at 23.

Commerce did not rely upon the "meetings and agreement" as "justification for rescinding

the review of Minh Phu Group."  The sole basis for rescinding the review was that

rescission was sought by all the parties who had requested review.  See Rescission

Notice, 81 Fed. Reg. at 47,758.  In fact, the regulations providing for rescission do not

require any rationale for rescission other than that rescission was requested.[22]  Although

Commerce stated that the parties sought the rescission because of the settlement that

was reached at the WTO, Commerce did not base its decision to rescind on the substance

of that settlement agreement.  Instead, Commerce concluded that, "because all parties

---

[21] Mazzetta also argues that Commerce should have placed the WTO Settlement Agreement on the record.  See Mazzetta Br. at 22–25.  The WTO Settlement Agreement reached is the culmination of meetings Mazzetta contends are ex parte and served to justify the rescission of review of MPG.  Id.  The statute does not require the agency to place on the record the WTO Settlement Agreement itself.  See 19 U.S.C. § 1677f(a)(3).

[22] Pursuant to 19 C.F.R. § 351.213(d)(1), when there is a withdrawal of a request for review

    [t]he Secretary will rescind an administrative review under this section, in whole or in part, if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review. The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so.

19 C.F.R. § 351.213(d)(1).

that requested a review of the Minh Phu Group have withdrawn their requests, the Department is rescinding the review with respect to the Minh Phu Group . . . ." Id.

The only decision that Mazzetta's argument implicates is Commerce's decision to extend the deadline to request rescission of the review.  The rationale given by each of the parties seeking an extension, and by Commerce granting the extension was that "[a] mutually satisfactory resolution of these disputes was not effectuated within 90 days of the date of publication of the notice of initiation of the requested review."[23]  Rescission Notice, 81 Fed. Reg. at 47,758.  There is no claim that Commerce based its decision to extend the deadline on the contents of the WTO Settlement Agreement or the discussions leading up to it.  The relevant factor, as stated by the parties seeking an extension to submit a request to rescind the review, and by Commerce in granting the extension, was the timing of the settlement at the WTO, not the resulting settlement's substance.  Id.  The record is therefore complete as to why Commerce granted the parties' requests, and Mazzetta has failed to set forth facts to establish a reasonable basis for determining that the record is incomplete.  Mazzetta assumes that the substance of the WTO Settlement

---

[23] Commerce extended the deadline for parties to request rescission because the parties in their requests provided the following rationale for why an extension was warranted.  The parties state that granting a request to withdraw a review request

> will assist in the implementation of a resolution to United States – Anti-dumping Measures of Certain Shrimp from Viet Nam (DS429) and United States Anti-dumping Measures of Certain Shrimp from Viet Nam (DS404) that is mutually satisfactory to the United States and Vietnamese Governments. A mutually satisfactory resolution of these disputes was not effectuated within 90 days of the date of publication of the notice of initiation of the requested review.

[MPG]'s Withdrawal of AD Review Request at 2–3, PD 335, bar code 3484285-01 (July 6, 2016); Domestic Producers' Partial Withdrawal of Request for Review at 3–4, PD 336, bar code 3484291-01 (July 6, 2016); Am. Shrimp Processors Ass'n Partial Withdrawal of Request for Review at 3, PD 337, bar code 3484301-01 (July 6, 2016).

Agreement led to the rescission, and therefore concludes that there must have been ex

parte discussions that would have affected Commerce's decision.  Mazzetta's assumption

is simply incorrect, since nothing more is required for a rescission other than a request.

See generally 19 C.F.R. § 351.213(d)(1).  Therefore, Mazzetta has only speculated that

"information relating to [the] proceeding was presented or discussed" at the WTO.

### III.    The Rescission of MPG's Review and the Calculation of the All-Others Rate

Mazzetta challenges Commerce's calculation of the all-others rate, on the grounds

that Commerce's decision to rescind the review as to MPG was contrary to law and not

supported by substantial evidence,[24]  and that, even if it was proper to rescind the review

as to MPG, Commerce should nonetheless have still used MPG's rate from the

preliminary determination in calculating the all-others rate.  See Mazzetta's Br. at 25–43;

see also Reply Br. Consol.-Pl. [Mazzetta] in Supp. Mot. J. Upon. Agency R. Pursuant to

Rule 56.2 at 1–8, Jan. 22, 2018, ECF No. 58.  Defendant argues that Commerce's

decision to rescind was reasonable, consistent with past practice, and supported by

substantial evidence because it was based on the same grounds proffered by the parties

---

[24] Mazzetta also argues that Commerce's decision to rescind is contrary to law because the dispute being resolved at the WTO related to the fourth administrative review of the ADD Order, was in no way connected to the pending tenth administrative review, and because section 129 proceedings do not empower Commerce to modify, amend, or rescind pending determinations. Mazzetta's Br. at 36–38.  However, the section 129 implementation notice only modified the results of the fourth administrative review as to MPG and revoked the ADD Order, in part, on MPG's entries made on or after July 18, 2016.  See See Certain Frozen Warmwater Shrimp From [Vietnam], 81 Fed. Reg. 47,756, 47,757 (Dep't Commerce July 22, 2016) (notice of implementation of determination under section 129 of the Uruguay Round Agreements Act and partial revocation of the [ADD] order).  The effect of the section 129 implementation notice on the separate rate respondents did not itself modify, amend, or rescind this review.

requesting rescission.[25]   Def.'s Resp. Br. at 23–26.   Further, Defendant argues that

Commerce's calculation of the all-others rate was based on a permissible interpretation

of the statute and that Mazzetta wrongfully attempts to read into the statute a

representativeness requirement.   See id. at 17–23.   For the reasons that follow,

Commerce's decisions to rescind the administrative review of MPG and to calculate the

all-others rate using solely Stapimex's rate are sustained.

## A. Rescission

Pursuant to regulation, Commerce "will rescind an administrative review . . ., in

whole or in part, if a party that requested a review withdraws the request within 90 days

of the date of publication of notice of initiation of the requested review."   See 19 C.F.R.

§ 351.213(d)(1).   The agency may extend this 90-day deadline for rescission if it "decides

that it is reasonable to do so."[26]   Id.   Here, all requests to review MPG were withdrawn

more than 90 days after the publication of the notice of initiation of this review.   See

Rescission Notice, 81 Fed. Reg. at 47,758.   In the Rescission Notice, Commerce

explained that the parties had reported that a "mutually satisfactory resolution" of two

WTO disputes did not occur within 90-days of initiation of the tenth review and that

---

[25] Defendant also argues that Mazzetta failed to exhaust its challenge to the Rescission Notice before the agency.   See Def.'s Resp. Br. at 24.   Mazzetta responds that Commerce cannot raise exhaustion as a defense because Commerce restricted the supplemental briefing solely to how the all-others rate should be calculated.   See Respondents' Reply at 7–8; see also Certain Warmwater Shrimp from [Vietnam]: Request [from Commerce] for Additional Briefing, PD 345, bar code 3497142-01 (Aug. 11, 2016).   The court agrees with Mazzetta.

[26] Commerce had previously interpreted 19 C.F.R. § 351.213(d)(1) as requiring a showing of "extraordinary circumstances," but the Court of Appeals for the Federal Circuit recently held that interpretation to be "an incompatible departure from the clear meaning of the regulation," Glycine & More, Inc. v. United States, 880 F.3d 1335, 1345 (Fed. Cir. 2018), confirming that, to extend the period in which a review request may be withdrawn, Commerce must only determine that extending the time to withdraw the request would be reasonable.

rescission would aid the United States and Vietnamese governments in resolving those WTO matters.[27]  Id.  The requesting parties explained that they could not foresee the need to rescind in the first 90-days of this review and that a rescission of the review would aid in implementation of the WTO Settlement Agreement.  See [MPG]'s Withdrawal of AD Review Request, PD 335, bar code 3484285-01 (July 6, 2016); Domestic Producers' Partial Withdrawal of Request for Review, PD 336, bar code 3484291-01 (July 6, 2016); Am. Shrimp Processors Ass'n Partial Withdrawal of Request for Review, PD 337, bar code 3484301-01 (July 6, 2016).  Commerce explained that, under these circumstances, it found it reasonable to extend the rescission deadline and that, because all requests to review MPG had been withdrawn, the agency would rescind the review as to MPG.[28]  Id. Commerce's regulations allow for rescission, in whole or in part, when the party requesting review withdraws its request.  See 19 C.F.R. § 351.213(d)(1).  Here, all requests to review MPG were withdrawn, and Mazzetta points to nothing to undermine the reasonableness of Commerce's decision to extend the deadline to request rescission

---

[27] Mazzetta argues that, contrary to Commerce's claims, Commerce does not have a practice for calculating an all-others rate when a review is rescinded.  See Mazzetta Br. at 34–35.  However, in the final determination, Commerce was not specifically referring to a practice for calculating an all-others rate when there is a late rescission.  Final Decision Memo at 64.  Instead, Commerce explained that it has a practice for calculating an all-others rate when there is only one respondent remaining.  Id.

[28] Mazzetta argues that in rescinding the review of MPG, Commerce deviated from its more than 14-year practice of denying late rescission requests, if Commerce had already "expended significant resources."  See Mazzetta Br. at 37 (quoting Issues & Decision Mem. for the 2010–2011 Admin. Review of Folding Metal Tables & Chairs from the People's Republic of China at 2–3, A-570-868, (June 27, 2012), available at https://enforcement.trade.gov/frn/summary/PRC/2012-16458-1.pdf (last visited June 18, 2018). Nevertheless, even given the fact that the requests to rescind were submitted almost five months after Commerce issued its preliminary determination, based on the circumstances of this case and Commerce's explanation, Commerce's actions are reasonable.

or to rescind.[29]   Commerce's decision is in accordance with law and is supported by substantial evidence.

### B. Calculation of the All-Others Rate

Mazzetta argues that, even if it was proper to rescind the review as to MPG, Commerce should have included MPG's rate from the preliminary determination in its calculation of the all-others rate, rather than basing the all-others rate solely on the rate calculated for Stapimex, the remaining respondent.[30]  See Mazzetta's Br. at 25–43.  In an antidumping investigation or administrative review, if it is not "practicable" for Commerce to review or investigate each known exporter or producer, Commerce may limit its examination to a "reasonable number of exporters or producers" and determine weighted-average dumping margins only for those selected.  19 U.S.C. § 1677f-1(c)(2).  The statute provides Commerce with two options for examination in such cases: it can either select "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined," 19 U.S.C. § 1677f-

---

[29] Mazzetta also argues that Commerce's decision to rescind should be invalidated because Commerce unreasonably failed to consider the adverse effect the rescission would have on the separate rate applicants.  See Mazzetta Br. at 38–41.  Mazzetta argues that cases like Arcelormittal Dofasco call on Commerce to consider "all the relevant circumstances" when deciding a party's rescission request.  Id. at 39 (quoting Arcelormittal Dofasco Inc. v. United States, 33 CIT 71, 78, 602 F. Supp. 2d 1330, 1336 (2009)).  However, in Arcelormittal Dofasco, the court found Commerce's reason for refusing to extend the deadline to request rescission to be inadequate.  See Arcelormittal Dofasco, 33 CIT at 76–78, 602 F. Supp. 2d at 1335–36.  By contrast, here, Commerce explained why it extended the deadline, see Rescission Notice, 81 Fed. Reg. at 47,758, and Commerce's explanation supports its decision to rescind the review as to MPG.

[30] The Respondents incorporate by reference Mazzetta's arguments on the separate rate issue, see Respondents' Br. at 45–46, but not Mazzetta's arguments challenging Commerce's decision to rescind the review of MPG.  See Respondents' Reply at 22 n.9.

1(c)(2)(B), or examine a statistically representative "sample of exporters, producers, or types of products[.]"   19 U.S.C. § 1677f-1(c)(2)(A).   The SAA explains that when Commerce employs the latter sampling method, it will "select the most representative sample at the early stages of the investigation or review," based on the information known to Commerce at that point in time.   See SAA at 873, 1994 U.S.C.C.A.N. at 4201 (emphasis omitted).   By practice, Commerce calculates a rate for the separate rate applicants pursuant to 19 U.S.C. § 1673d(c)(5).   See Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).   Section 1673d(c)(5) provides a method to calculate the all-others rate and states that the all-others rate shall be the weighted average of the individually investigated exporter's and producer's dumping margins, excluding any margins that are de minimis, zero or determined entirely by application of an adverse inference.   See 19 U.S.C. § 1673d(c)(5).[31]

In the final determination, Commerce explained its practice to assign to the separate rate respondents the all-others rate pursuant to 19 U.S.C. § 1673d(c)(5)(A).   See Final Decision Memo at 62–63.   Here, following the rescission of the review as to MPG, only one mandatory respondent, Stapimex, remained under review.   Commerce explained that, as neither 19 U.S.C. § 1673d(c)(5)(A) nor 19 U.S.C. § 1677f-1(c)(1) address how Commerce is to calculate a rate for the separate rate respondents following

---

[31] The SAA instructs that where the margins for all individually investigated exporters and producers are zero, de minimis, or solely the result of Commerce using an adverse inference, Commerce should calculate the all-others rate using "any reasonable method" and outlines the "expected method[.]"  SAA at 873, 1994 U.S.C.C.A.N. at 4201.  However, the SAA also provides that if the "expected method" calculates an average "not reasonably reflective" of the dumping margins of the not individually investigated respondents, Commerce may calculate the all-others rate "us[ing] other reasonable methods."  Id.

either the rescission of a review or when only one mandatory respondent is examined, it

followed its practice and assigned as the all-others rate the only remaining calculated rate

that was neither de minimis nor the result of applying an adverse inference. Id. at 63–64.

Further, Commerce explained that, prior to rescinding the review, it did not calculate a

final dumping margin for MPG and only had before it MPG's sales and factors of

production ("FOP") data that was collected and verified for the preliminary determination.

Id. at 64.  Accordingly, it assigned Stapimex's rate, the only remaining above de minimis

rate, as the all-others rate.  See id. at 63–64.

　　　Commerce reasonably based the all-others rate on the rate of the only remaining

respondent in the review, Stapimex.   Nothing in the statutory framework requires

Commerce to calculate the all-others rate using multiple rates nor precludes Commerce

from relying on just one rate.  Mazzetta argues that, because 19 U.S.C. § 1677f-1(c) and

19 U.S.C. § 1673d(c)(1)(B), (c)(5) consistently use the plural "exporters" and "producers"

to refer to the individually investigated respondents, the all-others rate must be based on

the rates of multiple respondents.  See Mazzetta Br. at 26–27.  Under the largest volume

exception, however, Commerce may choose to investigate only one exporter or producer,

in which case there would not be multiple established rates.  See 19 U.S.C. § 1677f-

1(c)(2).  The statute simply provides for the possibility of Commerce having multiple

established rates at the end of a given investigation or review; it does not necessitate the

calculation of an all-others rate using multiple respondents' rates at the end of every

investigation or review.  Further, the language of 19 U.S.C. § 1673d(c)(5)(B) that guides

Commerce's actions when an established rate is zero, de minimis, or based entirely on

an adverse inference, likewise uses the plural "exporters and producers."  It is nevertheless possible that, if any one or all three of those circumstances occur, Commerce can be left with only one respondent.  Mazzetta's construction of the statute, however, would imply that Commerce could not rely on just one respondent's rate, while in fact the statute envisions cases when that may happen.

Mazzetta also argues that the statutory framework requires the resulting all-others rate to be representative, which requires it to be based on multiple rates, where available.  See Mazzetta's Br. at 27–29.  The all-others rate here is representative.  As explained above, the SAA directs Commerce to narrow its review or investigation to respondents able to provide a representative sample.  See SAA at 872–73, 1994 U.S.C.C.A.N. at 4200–01.  Mazzetta does not challenge the original selection of mandatory respondents for the tenth administrative review.  It is not an unforeseeable occurrence for Commerce, at the end of an investigation or administrative review, to be left with only one respondent. The loss of a respondent does not automatically mean that the resulting all-others rate is not representative.  If that was the case, the exception in 19 U.S.C. § 1673d(c)(5)(B) would not exist.[32]

---

[32] In this regard, Mazzetta also argues that Stapimex's rate is not representative of the separate rate respondents.  See Mazzetta Br. at 31–33.  Mazzetta notes that MPG's U.S. sales were valued using the hybrid differential pricing methodology, while all of Stapimex's U.S. sales were valued using the A-to-T comparison methodology.  Id. at 31–32.  However, other than generally claiming that the separate rate respondents have "varied business practices," Mazzetta points to no record evidence corroborating its claims that imports of the separate rate respondents are dissimilar to those of Stapimex.  The fact that Stapimex engaged in different business practices than MPG and sold to different customer bases does not support the conclusion that the separate rate applicants' selling behavior is inapposite to Stapimex's or render Commerce's determination unreasonable.

(footnote continued)

## IV.   Commerce's Analysis of Specific Surrogate Values

The Respondents challenge Commerce's surrogate value data selections for head and shell byproduct, frozen shrimp, and ice.  See Respondents' Br. at 35–43.  Defendant refutes all of these challenges and argues that Commerce's final determination should be sustained in all respects.  See Def.'s Resp. Br. at 39–41, 42–52.  For the reasons that follow, the court sustains Commerce's surrogate value selections for head and shell byproduct and ice.   However, the court remands Commerce's surrogate value data selection for frozen shrimp for further explanation and consideration.

### A.  Legal Framework

In antidumping proceedings involving NMEs,[33] Commerce generally calculates normal value using the FOPs used to produce the subject merchandise and other costs and expenses.  19 U.S.C. § 1677b(c)(1).  Commerce will value respondents' FOPs using the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."   19 U.S.C. § 1677b(c)(1)(B).  To the extent possible, Commerce uses FOPs from market economy

---

At oral argument, Mazzetta also argued that 19 U.S.C. § 1673(c)(5) requires Commerce to calculate the all-others rate based on the rates of all respondents that Commerce investigated.  See Oral Arg. at 00:29:52–00:30:01, 00:30:07–00:30:25.  Here, Mazzetta contends, aside from calculating the final weighted-average dumping margin, the review of MPG was complete.  Id. at 00:26:40–00:26:46.  Defendant responded that the rate has to be established, meaning that it was assigned to the respondent.  See Oral Arg. at 00:38:55–00:39:00.  Defendant's interpretation of the statute is not unreasonable.

[33] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).

countries that are: "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).  Commerce's regulatory preference is to "value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).

Commerce's methodology for selecting the best available information evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited June 18, 2018); Final Decision Memo at 54–55.  Commerce uses the same methodology to calculate the surrogate value of byproducts generated during the production process, and offsets production costs incurred by a respondent by the value of those byproducts.  See Final Decision Memo at 46–47, 50; see also Tianjin Magnesium Int'l Co., v. United States, 34 CIT 980, 993, 722 F. Supp. 2d 1322, 1336 (2010); Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1422–23, 460 F. Supp. 2d 1365, 1373–74 (2006).

### B.  Head and Shell Byproducts

The Respondents challenge Commerce's use of the Indian Global Trade Atlas ("GTA") import data for subheading 0508.00.50, Harmonized Tariff Schedule ("HTS"), to value head and shell byproducts, and argue that Commerce should have instead used Bangladeshi UN Comtrade import data covering HTS 0508.00.  See Respondents' Br. at 35–39; see also Final Decision Memo at 57–59; [Petitioner's] [Surrogate Value]

Comments at 2, Ex. 2, PD 232, bar code 3297256-01 (Aug. 10, 2015) ("Indian GTA Shell & Head data"); [VASEP] [Surrogate Value] Submission at Ex. 3, PD 235, bar code 3297559-02 (Aug. 10, 2015) ("Bangladeshi UN Comtrade Shell & Head data").  Defendant contends that Commerce's decision to use Indian GTA Shell & Head data to value head and shell byproduct is supported by substantial evidence and is in accordance with law.  See Def.'s Resp. Br. at 48–52.  The court agrees with Defendant.

Commerce's decision to use Indian GTA Shell & Head data to value head and shell byproduct is supported by substantial evidence.  Commerce found the Indian GTA Head & Shell data to be contemporaneous, publicly available, representative of a broad market average, and tax and duty exclusive.  Final Decision Memo at 57–58.  Commerce also explained that the Bangladeshi UN Comtrade Head & Shell data valued the whole shrimp at a lower cost than its waste byproduct, i.e., the shell and head.  Id. at 58.  Although the Respondents claim that Commerce should not have defaulted to rejecting the Bangladeshi UN Comtrade Shell & Head data for HTS 0508.00 over capping it because the byproduct value exceeded that of the whole, see Respondents' Br. at 38, Commerce's decision to reject the data is within its discretion.

The Respondents also argue that Commerce did not adequately explain its reasoning for rejecting the Bangladeshi data.  See Respondents' Br. at 36–37; see also Respondents' Reply at 20–22.  Specifically, they challenge Commerce's explanation that it was unable to evaluate the appropriateness of the Bangladeshi UN Comtrade Head & Shell data because it lacked a written description, yet relied on Bangladeshi UN Comtrade

data for a different HTS category of the same level of descriptiveness to value ice.[34]  See

Respondents' Br. at 36–37; see also Respondents' Reply at 20–22.    However,

Commerce's reasoning for rejecting the Bangladeshi UN Comtrade Head & Shell data is

not based solely on a missing description.    In the final determination, Commerce

explained that it had before it a six-digit Bangladeshi UN Comtrade Head & Shell HTS

number and an eight-digit Indian GTA Head & Shell HTS number, and that without a

written description it "logically" determined that the latter was more specific than the

former.  Final Decision Memo at 58.  Further, as explained above, Commerce exercised

its discretion and rejected the data source because the relative value of the byproduct

exceeded the value of the main input, i.e., whole shrimp.[35]

---

[34] The Respondents also argue that because Commerce has recognized the UN Comtrade as a
reliable data source, has relied on it in this review to value ice, and has run searches on its
website, it is disingenuous for it to claim that it was unable to evaluate whether the Bangladeshi
UN Comtrade Head & Shell data was appropriate here.  See Respondents' Br. at 36.  The
Respondents' comparison to Commerce's valuation of ice is not persuasive.  The choice before
Commerce as to valuation of ice was not analogous to Commerce's choice for valuation of head
and shell byproduct.  The UN Comtrade data provided to Commerce to value ice did have a
written description, and was chosen over another Bangladeshi source which, because it
represented the experience of one Bangladeshi shrimp processor, did not represent a broad
market average.  See Final Decision Memo at 53–54.

[35] The Respondents also ask the court to take notice of the 89% reduction in value of respondents'
byproduct as a result of Commerce using a different Indian GTA HTS category in the ninth
administrative review of the ADD Order, as compared to the HTS category used in this review.
See Respondents' Reply at 22.  They contend that the valuation difference constitutes a "dramatic
change" that should not be allowed. Id.  Commerce addressed the variances in the HTS category
selected, specifically remarking that the record developed in the tenth administrative review did
not contain the data used in the ninth administrative review.  Final Decision Memo at 59.  The
court will not evaluate the data Commerce chose to rely upon in this review as compared to data
placed on the record in an earlier review.  Each review stands on its own.  See E.I. DuPont de
Nemours & Co. v. United States, 22 CIT 19, 32–33 (1998).

**C. Frozen Shrimp**

The Respondents challenge as contrary to law and unsupported by substantial evidence Commerce's valuation of the frozen shrimp input using Bangladeshi UN Comtrade data for HTS 0306.13.  <u>See</u> Respondents' Br. 39–41.  Defendant argues that Commerce's use of the Bangladeshi data is reasonable and constitutes the best available information to value the input because the data is from the primary surrogate country. Def.'s Resp. Br. at 42–44.  The court remands Commerce's determination because Commerce has failed to explain why it is reasonable to default to data from the primary surrogate country when that data is not contemporaneous and the record includes a more specific data source.

In the final determination, Commerce valued respondents' frozen warmwater shrimp input using Bangladeshi UN Comtrade data for HTS 0306.13, covering "Shrimps & prawns, whether/not in shell, frozen."  <u>See</u> Final Decision Memo at 46–48.  There were just two potential surrogate values on the record for this input: the Bangladeshi UN Comtrade data and the Indian GTA data.  <u>Id.</u> at 46.  Commerce explained that, since both the Bangladeshi UN Comtrade data and the Indian GTA data on the record are from basket categories, the agency would rely on the Bangladeshi data because it is from the primary surrogate country.  <u>See id.</u> at 47.  Commerce justified its use of the Bangladeshi data, which is not contemporaneous, over the Indian data, which is contemporaneous, by emphasizing its preference for data from the primary surrogate country.  <u>See id.</u>  At oral argument, Defendant and Defendant-Intervenor further explained that, in choosing

between two basket categories, where both data sets are equally non-specific, primary surrogate country data is preferred.  See Oral Arg. at 02:03:28–02:04:03.

Commerce's selection of the Bangladeshi data was not reasonable in light of evidence that it is from a far less specific category than the Indian data.  The Bangladeshi UN Comtrade data for HTS 0306.13 covers, "Shrimps & prawns, whether/not in shell, frozen."  Surrogate Values for the Prelim. Results at Ex. 3e, PD 313, bar code 3446496-01 (Mar. 3, 2016).  Forty-one percent of shipments covered by this data are from coldwater regions, even though coldwater shrimp is not used in the production of warmwater shrimp in Vietnam.  See id.  By comparison, the Indian GTA data for HTS 0306.17 covers "Shrimps & prawns, Frozen, Other Than Cold-Water" and is limited to warmwater shrimp.    [Certain Frozen Warmwater Shrimp from Vietnam—ASPA's Surrogate Value] Comments at Ex. 1, PD 232, bar code 3297256-01 (Aug. 10, 2015).

Commerce has not explained why the Bangladeshi UN Comtrade data constitutes the best available information, in light of the record evidence that a percentage of the Bangladeshi UN Comtrade data includes coldwater shrimp.  Commerce does not address the record evidence regarding the percentage of coldwater shrimp, except to say that "the nature of the underlying data of the countries included within the import statistics do not impact the Department's requirement to select the best available information on the record to value purchased semi-processed frozen shrimp with a frozen shrimp [surrogate value]."  Final Decision Memo at 48.  Further, by emphasizing that it prefers surrogate country data when the two HTS categories are basket categories, see id. at 47, Commerce simply restates a regulatory preference without supporting its decision with

record evidence.  Commerce has not explained why this preference is reasonable in light of evidence that the two data sets are not equally specific.  Commerce's decision to value frozen shrimp using Bangladeshi UN Comtrade data is not reasonable based on this record, and is remanded to the agency for reconsideration or further explanation consistent with this opinion.

### D.  Ice

The Respondents challenge Commerce's selection of Bangladeshi UN Comtrade data covering HTS 2201.90 to value the respondents' ice input because it was not specific to the input, and argue that Commerce should have instead valued the input using ice cost data generated by Apex Foods Limited in 2013–2014 ("Apex 2013–2014 data").  See Respondents' Br. at 42–43; see also [VASEP] [Surrogate Value] Submission Ex. 4, PD 235, bar code 3297559-02 (Aug. 10, 2015).  Defendant argues that Commerce's selection is in accordance with law and is supported by substantial evidence.  See Def.'s Resp. Br. at 45–48.  The court agrees with Defendant.

In the final determination, Commerce explained that Bangladeshi UN Comtrade Ice data constitutes the best information available to value ice because it is specific to respondents' input, publicly available, representative of a broad market average, and tax and duty exclusive.  See Final Decision Memo at 53–55.  Commerce acknowledged that the Bangladeshi UN Comtrade Ice data was not contemporaneous, but explained that it was nevertheless "superior" to the Apex 2013–2014 data which represented only the experience of a single shrimp producer in Bangladesh.  Id. at 54.

The Respondents challenge Commerce's reliance on the Bangladeshi UN Comtrade Ice data because that HTS category includes a "patently inapplicable input data (i.e., snow)" and is not contemporaneous. Respondents' Br. at 42. However, Commerce explained that respondents did not contend that the ice covered by the Bangladeshi UN Comtrade data is different from the ice utilized by Stapimex and did not provide Commerce with "an HTS number for the specific ice that Stapimex purchased," instead "offer[ing] a single financial statement upon which to rely for an ice [surrogate value]." Final Decision Memo at 55 (citation omitted). The Respondents have not explained why the Bangladeshi UN Comtrade Ice data is not specific to the ice input. Further, without more, the court cannot say that the selection of a source representing a broad market average, rather than a source specific to a single company, is unreasonable.[36]

## V.   Commerce's Denial of an Offset for Packaging Scrap

The Respondents challenge Commerce's decision to deny an offset for packaging scrap revenue and contend that the excess or scrap packaging should have been treated as all other byproducts. See Respondents' Br. at 43–45. Defendant argues that, in light of Commerce's discretion in this area and the fact that packaging scrap is not directly

---

[36] The Respondents also argue that Commerce has, in the past, relied on price quotes over industry wide data, citing the remand redetermination issued by Commerce following Catfish Farmers of America v. United States, 38 CIT __, Slip Op. 14-146 (Dec. 14, 2014) in support of this argument. See Respondents' Br. at 43; see also Final Results of Redetermination Pursuant to [Court Order in Slip Op. 14-146] at 13, A-552-801, (June 26, 2015) available at https://enforcement.trade.gov/remands/14-146.pdf (last visited June 18, 2018) ("Catfish Farmers of America Remand Redetermination"). However, Catfish Farmers of America Remand Redetermination is inapposite. In its remand redetermination, Commerce explained that because fish waste byproduct was not traded internationally, using import statistics would overinflate the surrogate value. Catfish Farmers of America Remand Redetermination at 12–13. Here, there is no comparable concern and again, the Respondents have not explained why Bangladeshi UN Comtrade Ice data is not specific to the ice input.

derived from the production of the subject merchandise, Commerce's decision was reasonable and lawful.  See Def.'s Resp. Br. at 52–54.  The court remands Commerce's decision because Commerce has not explained why its practice is reasonable.

Pursuant to the relevant statute, in an NME Commerce will calculate the normal value of a given product by valuing "the factors of production utilized in producing the good[.]"  19 U.S.C. § 1677b(c)(1)(A)–(B).  The statute, however, does not direct how Commerce is to determine which products qualify for the byproduct offset and no regulation exists to fill the gap.  In such a situation, Commerce has the discretion to set the standards by which items qualify for a byproduct offset, so long as Commerce's selection satisfies the overall purpose of the ADD statute, to calculate accurate dumping margins and is reasonable.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

In the final determination, Commerce declined to grant a byproduct offset for packaging materials that either contained the raw materials used to produce the subject merchandise or were purchased, but not used, to pack the subject merchandise.  See Final Decision Memo at 67–68.  Commerce explained that it denied the offset because pursuant to its practice an offset is granted only for byproducts that are generated in relation to, or as a result of, the production of the subject merchandise.[37]  See id.

---

[37] The Defendant and the Defendant-Intervenor likewise argue that Commerce's decision was reasonable because pursuant to Commerce's practice packaging scrap is not a byproduct generated in the production of the subject merchandise and that Commerce has the discretion to impose such a practice.  See Def.'s Resp. Br. at 53–54; Def.-Intervenor's Resp. Br. at 41–43.  However, neither the Defendant nor the Defendant-Intervenor identify Commerce's rationale for its practice.

Commerce, however, does not offer an explanation for why its practice is reasonable and justifies its denial of the byproduct offset by reiterating its practice, citing to prior determinations where the practice was applied, and stating that the excess/scrap packaging at issue is not a byproduct.  See id.  The court reviewed the prior determinations to which Commerce cites, however, none of these determinations explain why the practice was adopted or why it is reasonable in light of the relevant statute.[38]

The statutory language does not exclude the possibility that scrap packaging would be utilized in the production of a good.  The statute calculates the normal value of a good based on the factors of production involved in producing the subject merchandise.  See 19 U.S.C. § 1677b(c)(1)(A)–(B).  Presumably, the value of the factor of production at issue here includes its packaging.  Commerce may have a rationale for excluding packaging as

---

[38] The determinations Commerce cites do confirm that a practice exists which Commerce applies to determine whether a given item is a byproduct, however, none of the determinations explain why the practice is reasonable or its origins.  See, e.g., Steel Wire Garment Hangers from the People's Republic of China [("PRC")]: Issues and Decision Memorandum for the Final Results of the First [ADD] Administrative Review at 20, A-570-918, (May 9, 2011), available at http://ia.ita.doc.gov/frn/summary/prc/2011-11871-1.pdf (last visited June 18, 2018) (explaining that Commerce has a practice of granting offsets for products "generated in the production of the subject merchandise," but not why the practice is reasonable or the origins of the practice); Issues and Decision Memorandum for the Final Determination of the [ADD] Investigation: Prestressed Concrete Steel Wire Strand [] From the [PRC] at 17, A-570-945, (May 14, 2010), available at http://ia.ita.doc.gov/frn/summary/prc/2010-12310-1.pdf (last visited June 18, 2018) (similarly explaining the parameters upon which an offset would be granted, without explaining the reasonableness of Commerce's practice); Certain Cut-to-Length Carbon Steel Plate From the [PRC], 62 Fed. Reg. 61,964, 61,997 (Dep't Commerce Nov. 20, 1997) (final determination of sales at less than fair value) (similarly explaining that Commerce has a "policy" pursuant to which it grants a byproduct offset, but not explaining the reasonableness of the policy itself); Issues and Decision Memorandum for the Final Determination in the [ADD] Investigation of Multilayered Wood Flooring from the [PRC] at 86, A-570-970, (Oct. 11, 2011), available at http://ia.ita.doc.gov/frn/summary/prc/2011-26932-1.pdf (last visited June 18, 2018) (articulating Commerce's policy as offsetting scrap generated in the production process, if evidence supports the conclusion that the claimed scrap has commercial value, but likewise not explaining why such a practice is reasonable).

a byproduct, but that rationale is not reasonably discernable and Commerce has not stated it.[39]   Therefore, Commerce's decision to deny an offset for excess/scrap packaging is remanded to the agency for reconsideration or further explanation consistent with this opinion.

## CONCLUSION

For the foregoing reasons, the court remands Commerce's surrogate value data selection for frozen shrimp, and sustains the Final Results in all other respects. Accordingly, it is

**ORDERED** that Commerce's decision to value frozen shrimp using Bangladeshi UN Comtrade data for HTS 0306.13 is remanded for reconsideration or further explanation consistent with this opinion; and it is further

**ORDERED** that Commerce's decision to deny an offset for excess/scrap packaging is remanded for reconsideration or further explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

---

[39] There are two types of packaging materials at issue here— packaging materials which contained the raw materials used to produce the subject merchandise, and packaging materials that were purchased to contain the subject merchandise, but which were not used.  See Final Decision Memo at 67.  In the final determination, Commerce did not distinguish between the two types of packaging materials.  However, on remand, Commerce may decide to do so.

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.


                                                       /s/ Claire R. Kelly
                                                      Claire R. Kelly, Judge

Dated: June 21, 2018
         New York, New York